## Doe *ex dem.* Duval's heirs v. McLoskey.

1. It is a general rule, that all persons whose interests are to be affected, or concluded by the decree, ought to be made parties to a bill for the foreclosure of mortgage. If the mortgagor who is the owner of the fee, dies, his heir is an indispensable party to a bill to foreclose.

2. Whenever the interest of a party to a suit, survives him, and becomes vested in another by his death, the suit abates as to the interest of the party dying, and the proper remedy to impart vitality to the suit, is a bill of revivor.

3. Where there is a decree for the foreclosure of a mortgage, and the sale of the premises, the purchaser cannot be regarded at law, as an assignee, of the mortgage.

4. The transfer of a debt (either by indorsement or a mere delivery,) secured by a mortgage, will in equity pass the security; and a written transfer of the debt and mortgage, will vest the assignee with the legal interest in both.

5. A mortgagee has three remedies, either of which he is at liberty to pursue, and all of which he may pursue until his debt is satisfied. 1. He may bring an action at law to recover the debt. 2. He may bring ejectment, or trespass to recover the possession of the mortgaged premises; and 3. He may foreclose the mortgagor's equity of redemption, and sell the land to satisfy the debt.

6. Where a mortgagee obtains a judgment at law, for the debt, the character of the indebtedness is changed; it then becomes a debt of record. So where there is a decree of foreclosure, the mortgage becomes merged in it, and ceases to exist as a legal security for the debt.

7. A decree of foreclosure and a sale under it, operates as a payment to the extent of the sum paid, and the payment of the debt will extinguish it, so as to leave no subsisting contract, which can be assigned.

Doe *ex dem.* Duval's heirs v. McLoskey.

8. *Semble*—A mortgagee may enter upon the land mortgaged or bring an action for the recovery of the possession, even before a forfeiture ; *unless it appears by ex-press stipulation or necessary implication, that the parties intended that the mortgagor should remain in possession.*

9. The mortgagor is the proprietor of the mortgaged premises, and entitled to their possession as against all persons, but the mortgagee or his assignee ; and if dispossessed, he may maintain an action to recover the possession.

10. A decree rendered by a county court, for the sale of the real estate of an intestate, upon a proceeding under the act of 1822, cannot be considered invalid, because the record does not contain a petition filed by the administratrix ; more especially, if it appear from an order, made in the cause, that the administratrix filed her petition pursuant to the statute.

11. The jurisdiction of the county court, under the first section of the act of 1822, " To authorize administrators to sell land belonging to the estate of the intestate to which a complete t't'e has not been made," attaches as soon as the court recognizes the petition of the administratrix ; and its decree cannot be *collaterally* impeached (if the jurisdiction is shown,) by the omission to designate the heirs by name in the petition, or elsewhere in the record, or by the direction of the citation to the guardian instead of the heirs.

12. Though the act of 1822, requires the commissioners appointed to sell the lands of an intestate, to make a report to the court, at the time designated in its order or decree, yet this requisition must be regarded as directory ; and if the commissioners fail to make their report at the appointed time, it is competent for the court to take measures to compel them to make it, and upon its being made, to confirm it by a final decree.

13. The record of a proceeding in the county court, at the instance of an administrator, to obtain a decree for the sale of the lands of an intestate, need not show that the cause was continued from term to term, up to its final disposition.—Its continuance will be intended, if the reverse does not appear.

14. Though it may not appear *in totidem verbis* from the decree of a county court, that it was rendered at a regular or adjourned term, if the contrary does not appear, it will be taken to have been rendered in conformity to the statute.

15. The county court may refuse to confirm the report of commissioners appointed under the act of 1822, to sell the lands of an intestate's estate, but it is not competent for that court, seven months after the confirmation of the report, to annul the final decree and order a re-sale.

16. Although the county court cannot decree the sale of the lands of a deceased person, on which mortgages exist, and provide for their payment from the proceeds,—*quere :* will not a sale of the mortgagor's interest under such a decree, confer upon the purchaser the right to redeem ?

17. It is no objection to the assignment of a mortgage, that the first names of several of the mortgages are spelt differently in the mortgagee and assignment, if it appears from a comparison of the two deeds, that the names are the same.

18. A mortgage which recites, that the mortgagor " is justly indebted to the said parties of the second part," (the mortgagees,) is not contradicted by the production of notes payable to one of the mortgagees alone.

19. Where the debt intended to be secured, is not described with such precision as to identify it, by a comparison with the mortgage, parol evidence of the identity is admissible.

20. A mortgagee cannot assign the right to the mortgaged property, without also assigning the debt to which it is an incident, yet it seems he may relinquish *by contract* the possession of the mortgaged premises to a third person, until the debt is paid.

21. *Semble*—An action of ejectment lies, even after a descent cast, though the right of entry may be tolled.

22. The right of entry by the mortgagee, or his assignee, results from the contract between the mortgagor and mortgagee and will not be divested by the death of the mortgagor, or other event which does not annul the mortgage, or bar a remedy upon it.

23. The omission of a creditor to present his claim against the estate of a deceased person, to the executor or administrator, within eighteen months after the grant of letters testamentary, or of administration, will not operate *an extinguishment* of the demand, but merely *bar its recovery.*

24. As the mortgagee has a specific lien upon the mortgaged property for the payment of his debt, he need not present his claim to the executor or administrator of the mortgagor, in order to entitle him to the benefit of his mortgage. Such a a course is proper where he considers the mortgage as furnishing an insufficient security, and looks to the executor, or administrator, to make good the deficiency. This being the law, it follows, that the mortgagor cannot avail himself of the non-presentation of the mortgagee's claim, as a bar to a bill to foreclose.

25. In an action to recover the possession of land, a deed for the property in dispute, executed by a third person is admissible evidence, without first showing that such person had a transferable title; but if such auxiliary proof is not adduced, the party against whom the deed is offered, may call upon the court to reject it, or instruct the jury as to its legal effect.

26. Letters written by the defendant, to the administratrix of the plaintiffs' ancestor, during her sojourn in a foreign country, which abound with professions of friendship, express great solicitude for the welfare of herself and family, and in form her of the situation of her business in the United States, do not tend to prove that the defendant's title to the lands in question, is invalid. The letters, if admissible for any purpose, can only serve to show that the title of the defendant, deduced from the administratrix, had its origin in fraud.

27. Depositions taken in a suit in chancery between the same parties, are not proper evidence, on the trial of an action at law; unless the witness be dead, &c.

28. The act of Congress of the 26th May, 1824, " granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of the said city," cannot be regarded as the foundation of an individual's title to the shore of the river Mobile. *Congress does not possess the constitutional right, to grant the shore of the navigable waters, within the States.*

29. The mere fact that the defendant held two letters of attorney, from the administratrix of the plaintiffs' ancestor, authorizing him to transact business for her

Doe *ex dem.* Duval's heirs v. McLoskey.

individually, and as administratix, will not cause his purchases of the lands of the ancestor, sold under a decree of the county court, to enure to the benefit of the plaintiffs.

30. The rule of the supreme court, for the government of the practice in chancery, requires, that where the court is satisfied by proper proof, that a suit at law and a bill in chancery are instituted, for the same claim or demand, " it shall be ordered that the plaintiff elect in which he will proceed, and that he dismiss the other." This rule is imperative, and a plaintiff will not be allowed to enter a *nolle prosequi*, but compelled to dismiss.

Writ of error to the Circuit Court of Mobile County.

THIS was an action of ejectment brought by the plaintiffs in error, for the recovery of the possession of certain real estate, situate in the city of Mobile.

On the trial, two bills of exceptions were taken to the ruling of the presiding judge.

The first bill embodies all the evidence of title offered, both by the plaintiffs and the defendant. To sustain the case on their part, the plaintiffs offered and read a deed, from Beneto Caro to Daniel Duval, their ancestor, for the premises in controversy. They also proved, that Beneto Caro was once the proprietor of the property conveyed, and that he died in 1814 or '15; and that Duval resided on the same, and died in possession, in March or April, 1824. After the death of Duval, his widow, Catharine Duval, with the plaintiffs, her children, remained in possession for some time. Catherine Duval was the daughter and heir of Beneto Caro. The widow of Beneto Caro, after the death of her husband, continued to reside on the premises, until 1817 or '18, when she moved away, and is now living at Pensacola; that by the Spanish laws, she is entitled to one half the acquisitions made by herself and husband. Mrs. Duval died in 1831 or '32.

It was further shown by the plaintiffs, that the tide water at Mobile, extended to about the middle of Water street, and that Royal was about three hundred feet west of Water street; that Daniel Duval had caused houses to be built on the premises, east of Water street, in the year 1821 or '22.

The plaintiffs then read the act of Congress of the 26th May,

1824, "granting certain lots of ground, to the corporation of the city of Mobile, and to certain individuals of the said city;" and then shewed, that all the land lying east of Water street, to the channel of the river Mobile, was covered by the water at the time of the purchase of Duval, and that Duval resided on, and improved, that part of the land mentioned in the declaration, lying west of Water street. It was also proved, that the lot east of Water street, lay between Church street on the south, and Horry street on the north, which latter, had been considered as the "north boundary street," mentioned in the act of Congress; because, at the time of its passage, there was no street bearing the latter designation, and Horry was the most northern street in the city.

The plaintiffs further read in evidence, a part of the civil code of the State of Louisiana, which is admitted by the defendant's counsel, to be the law in force in 1825, by which it appeared, that a community of goods, as between man and wife, was was always presumed, until the contrary was shown. Here the plaintiffs rested their case.

The defendant then, to defeat the evidence of title, adduced by the plaintiffs, offered to read a mortgage made by Daniel Duval, on the 29th December, 1822, to Jonathan Hunt, to secure the payment of one thousand dollars, on the 1st day of June, 1823, together with a record of the proceedings and decree, by which the equity of redemption of the premises was foreclosed, pronounced by the circuit court of Mobile, at a term holden in May 1827: also, a deed, from the master in chancery, to the defendant. This mortgage embraced the lot east of Water street.

The precise day when this bill was filed does not appear. The prayer however is, that a subpœna may issue, returnable to the term of the circuit court, to be holden on the second Monday after the fourth Monday in March, 1825. At the April term, 1825, the cause was continued. At February term 1826, the death of Daniel Duval, the sole defendant, was suggested, and a *sci. fa.* directed to issue to Catherine Duval, his admin-

istratrix—which was issued and executed; and afterwards at an intermediate term holden in May next thereafter, " Catherine Duval, administratrix of the estate of David Duval, deceased, by her solicitor makes herself a party and prays a continuance, &c." At the time the last recited order was made, the record discovers the following: " This day came the plaintiff by his solicitor, and moved the court to appoint a guardian for the infant heirs of the said Daniel Duval, and for *scire facias* to issue to said guardian. Whereupon it is ordered, adjudged and decreed, that John F. Everett be appointed, and hereby is appointed guardian as aforesaid, and that *scire facias* issue, as by the said plaintiff is prayed."

At a term of the court holden in May, 1827, it was referred to a master, to take and state an account of the amount due on the mortgage, and report the same immediately; whereupon the master forthwith reported, in obedience to the order of reference a balance of seven hundred and ninety-nine dollars and eighteen cents, to be due the mortgagee for principal and interest. At the same time a decree was ordered, directing a sale of the mortgaged premises to pay the sum ascertained to be due, unless it shall be previously paid by the mortgagor; and requiring the master appointed to sell, and to execute a deed or deeds to the purchaser or purchasers. At February term, 1828, the master made his report, stating that he had sold the mortgaged premises to the defendant, the terms, &c., which report was in all things confirmed by the court.

Together with the mortgage to Hunt, and the record of the proceedings of the circuit court of Mobile in regard thereto, the defendant offered the deed made on his purchase at the master's sale, regularly proved, recorded and certified. To all of which evidence, the plaintiffs by their counsel objected, as being irrelevant, and incompetent, but the court overruled the objection, and permitted the same to go to the jury—and thereupon the plaintiffs excepted.

The defendant next offered in evidence, the record of certain proceedings of the county court of Mobile, touching part of the

90

real estate of Daniel Duval, deceased, under which the defendant set up a title to a portion of the premises in dispute, as a purchaser. From this record it appears that the county court was twice applied to for an order to sell parts of the estate of the decedent, upon suggestions that the personal estate was insufficient to pay his just debts—but in neither case does the record set forth a petition as the statute contemplates.

The first order was made on the third Saturday in January, 1826, and recites, that Catherine Duval presented and filed her petition as administratrix, &c., stating that the personal estate of her intestate, was "insufficient to pay his just debts, and praying an order for the sale of certain real estate, which the said Daniel Duval died possessed of; which said real estate is particularly described in the said petition:" and stating that Daniel Duval left seven children, his heirs, to wit: Annette, &c., particularly naming them, all of whom are under twenty-one years of age, and resident in the city of Mobile. Whereupon, it was "ordered that John Elliott be, and he is hereby appointed guardian of the heirs aforesaid; and it is further ordered that a citation issue to the said John Elliott, guardian as aforesaid," to appear &c., on the third Saturday in February next thereafter, "to answer the petition aforesaid."

The county court seems to have taken no step in the matter, until the third Saturday in March, 1826; an order was then made, requiring proof to be taken by deposition, as in chancery cases, during the ensuing vacation, &c. On the third Saturday in April, 1826, the county court rendered a decree, requiring certain real estate alledged to have belonged to Daniel Duval at the time of his decease, to be sold by Joseph Krebs, and Samuel H. Garrow, as commissioners, &c., all of which is particularly described in the decree. On the third Saturday in July, 1826, the commissioners reported to the county court, that they had executed its decree, by a sale of the estate it embraced, and their report being inspected and ascertained to be regular, the same was confirmed, and the commissioners ordered to make deeds to the purchasers, &c.

On the 4th April, 1827, it appears from an order in the record, that Catherine Duval, as administratrix, &c., presented and filed another petition in the county court, " stating that the personal estate (and also the sale of lands hereafter made by an order of this court,) is not sufficient to pay the just dues of said deceased, and praying an order for the sale of certain real property described in the said petition." Thereupon, it was ordered, " that John Elliott be appointed guardian *ad litem* of the infant heirs of said deceased, and that a citation issue to him to appear, &c., on the second day of May next, to answer the petition aforesaid." The order of January, 1826, it will be discovered varies from this—in the former the names, minority and residence of the heirs are stated, while in the latter they are entirely omitted. The county court rendered a decree on the 5th of May, 1827, reciting that John Elliott, guardian *ad litem* of the heirs of Daniel Duval, having denied the allegations of the petition, and it being shown that the personal estate was insufficient to pay the debts of the deceased. " Therefore it is ordered, that the real estate as set forth in the petition, be sold on the following terms, &c." It was also " ordered, that Henry V. Chamberlain and Curtis Lewis, be appointed commissioners to sell the same, and that they make their report to this court within sixty days from this date."

On the 22d December, 1827, the commissioners made their report to the county court, setting forth, that on the 23d June preceding, they had sold as directed by the decree, certain real estate situated in the city of Mobile, (which is particularly described in the report) and that Philip McLoskey was the highest bidder and had complied with the terms of the sale; thereupon the court ordered that the commissioners do convey the property to the purchaser, &c.

On the 19th July, 1828, an entry was made of record in the county court of Mobile, reciting the decree of the fifth of May, 1827, and the report of the commissioners and proceedings thereupon—and stating that Philip McLoskey bid off a lot (describing it,) under the belief that the mortgages on the same

would be received in payment of the purchase money—he holding the mortgages, and never having received any conveyance of title from the commissioners. The court thereupon ordered, that the commissioners sell the lot and premises on the 11th day of August next thereafter, at, &c., on the following terms, &c., and that they make their report on or before the third Saturday of August next."

On the 14th August, 1828, the commissioners made their report, stating that they had sold the lot, &c. in obedience to the order of July preceding, and that John R. Elliott became the purchaser, &c., and had complied with the terms of the sale; the court thereupon confirmed the report, and directed a conveyance to be made to the purchaser. The defendant then gave in evidence, a deed from the commissioners to Elliott, and from Elliott to the defendant, both of which are duly acknowledged, recorded and certified.

In respect to the entire proceedings had in the county court, the plaintiffs objected to their admission as evidence, because they were *coram non judice* and void. But the court overruled the objection, and permitted the same to be read to the jury: whereupon, the plaintiff excepted, &c.

It was admitted by the defendant's counsel, that ten dollars, was the entire consideration paid by Elliott upon his purchase on the re-sale, and that he purchased as the agent, and at the instance of the defendant. The report of the commissioners, and their deed to Elliott, show, that ten dollars was the sum for which the property was bid off. To the reading of the deeds to Elliott, and from him to McLoskey, the plaintiffs objected; because they were wholly irregular and void, but the court overruled the objection, and permitted the deeds to go as evidence to the jury: thereupon, the plaintiffs excepted, &c.

The defendant next offered, in evidence, a mortgage for a part of the property in controversy, from Daniel Duval to Maria Machado Caro, Sebastian Caro, Beneto Caro, Ambrose Caro and Annette Caro. The mortgage bears date on the 5th day of December, 1821, and recites, that "whereas, the said Daniel Duval

Doe *ex dem.* Duval's heirs v. McLoskey.

is justly indebted to the said parties of the second part, in the sum of four thousand dollars, lawful money of the United States of America, secured to be paid by two certain bonds or obligations, bearing even date with these presents, in the penal sum of lawful money, as aforesaid, conditioned for the payment of, as by said bonds or obligations, and the conditions thereof, reference being thereunto had, may more fully appear." This mortgage was acknowledged and recorded according to law, in the clerk's office of the the county court of Mobile. To the admission of this paper as evidence, the plaintiffs objected, as being irrelevant and incompetent, because it was not connected with the defendant's title, and did not contribute to its support; but the objection was overruled, and the evidence admitted: and thereupon, the plaintiffs excepted, &c.

The defendant next offered, in support of his title, a paper, purporting to be an assignment of the mortgage above referred to, under the hands and seals of the assignors. This deed, in consideration of four thousand dollars, paid by the defendant to the assignors, grants, bargains, sells, assigns, transfers and sets over unto the said party of the second part, his heirs and assigns forever, the said lot and premises above described, with the appurtenances, and all the estate of the said parties of the first part, by virtue of the said indenture of mortgage above recited." The assignment bears date on the 28th May, 1825, and was recorded by the clerk of the county court of Mobile, on the 18th June next thereafter. To the reading of this paper as evidence, the plaintiffs objected, because it does not purport to be an assignment of the mortgage; the assignors not being the same parties as the mortgagees; that all the mortgagees had not united in the supposed assignment; and that the assignment was void, because the debts secured by the mortgage, were not assigned to the defendant; but the court overruled the objection, and permitted the paper to be read in evidence to the jury: whereupon, the plaintiffs excepted, &c.

In connection with the deed of assignment, the defendant offered in evidence, two promissory notes, as follows:

"$2000. Twelve months after date, I promise to pay Maria Machado Caro, two thousand dollars, value received. Mobile, 5th day of December, 1821. D. DUVAL.

*Testigo:* PABLO PALMES."

On this note, was the following assignment: " Mobile, 28th of May, 1825. I assign the within note to Philip McLoskey.

her

MARIA MACHADO ⋈ CARO,

mark.

Witness: DAVID RUST."

"$2000. Two years after date, I promise to pay Maria Machado Caro, two thousand dollars, value received. Mobile, the 5th day of December, 1821. D. DUVAL.

*Testigo:* PABLO PALMES."

On which note, was the following assignment: " Mobile, 28th day of May, 1825. I assign the within note to Philip McLoskey.

her

MARIA MACHADO ⋈ CARO,

mark.

Witness: DAVID RUST."

The signatures to the notes and assignments, being proved, and the defendant alledging them to be the same, that were secured by the mortgage from Duval to the Caros'. The plaintiffs, by their counsel, objected to their admission as *evidence,* because they did not appear to be the obligations secured by the mortgage, and because they had not been presented to the administratrix of the estate of Daniel Duval, within eighteen months after the death of the intestate; nor had they at any time been presented either to the administratrix or to the heirs; but the court overruled the objection, and permitted the notes with their indorsements, to be read to the jury: whereupon, the plaintiffs excepted, &c.

The defendant also offered, in support of his title, a deed of conveyance, dated the 24th day of May, 1825, from Maria Machado Caro and Catharine Duval, for a part, or all the property in controversy, to himself; which deed, was duly proved,

and recorded in the office of the clerk of the county court of Mobile. The plaintiffs objected to the reading of this deed, because Madame Caro had no right, and Mrs. Duval had no right, that could be legally transferred, and for other causes not stated; but the court overruled the objection, and permitted the deed to be read to the jury: and the plaintiffs again excepted, &c.

Here the evidence on the part of the defendant closed; and the plaintiffs, in order to rebut the same, proposed to read six letters, written by the defendant, at Mobile, to Catharine Duval, in Cuba: the first dated the 29th July, 1828, and the last on the 14th December, 1828. These letters abound with professions of friendship; speak of improvements made on real estate of Mrs. Duval, in Mobile; of expected income from rent; of her children and friends in the United States; and her children who are with her; and express an anxious concern for her comfort. To the reading of these letters, the defendant objected, except so far as they went to establish a fraud in him, which objection was sustained, and the letters were thus restricted as evidence: whereupon, the plaintiffs excepted, &c.

The plaintiffs next offered as evidence, several depositions taken in a suit in chancery then pending, between the heirs of Daniel Duval complainants, and Philip McLoskey *et al.* defendants. But the defendant objected to their admission, and the court sustained the objection, because the depositions were taken in a chancery suit, and did not appear to be between the same parties. The plaintiffs, by their counsel, then proposed to read the depositions against McLoskey alone, but the court rejected them, and thereupon the plaintiffs excepted, &c.

After the evidence and arguments were closed, and before the jury retired to deliberate upon their verdict, the counsel for the plaintiffs requested the court to charge the jury, that if they were satisfied from the evidence, that the plaintiffs, on the 26th day of May, 1824, were the proprietors and occupants of the lot, west of Water street, and adjoining the river Mobile, and that the said lot had been improved prior to the 26th day of May, 1824, and that said lot lay between Church street, and

North Boundary street, in the city of Mobile, that the said plain-tiffs had brought themselves within the above mentioned act of Congress, and that it vested in them the title to the land east of Water street, and to the channel of the said river Mobile." Which instruction the court refused to give, but instructed the jury, " that if Daniel Duval had mortgaged the premises in his lifetime, that they were subject to the mortgage, and did not vest in the plaintiffs by virtue of the said act of Congress." To which instruction, and refusal to instruct, as asked, the plaintiffs, by their counsel, excepted, &c.

The plaintiffs read to the jury two letters of attorney fiom Mrs. Duval to the defendant, both dated the 21st June, 1828—the one authorizing the defendant to act as her attorney, touching the business of the estate of her deceased husband—the other authorizing him to transact business in which she was individually, concerned. Under this proof the plaintiffs insisted, that the purchases made by the defendant, of the real estate of their father, inured to their use, but the court charged the jury, that if the letters of attorney established a trust, the plaintiffs could not be relieved at law, but relief must be sought in equity.

*The second bill of exceptions* relates to a motion made by the defendant, to compel the plaintiffs to elect, whether they would prosecute this case, or a suit pending in equity for the same iden-tical cause.

Though the judgment of the circuit court is rendered against Philip McLoskey alone, yet the notice from the casual ejector is addressed to, and served upon himself, and seven others. The plaintiffs, upon the motion being made to elect, offered to strike the name of the defendant from the record, and proceed against the others, but the court refused to permit them to enter a *nolle prosequi* as to the defendant, but put them to their election, and thereupon the plaintiffs dismissed their suit in equity. The re-maining questions arising upon this bill of exceptions, are con-sidered as necessarily pertaining to the chancery record, and not revisable in the present case.

Hopkins & J. Gayle, for the plaintiffs—argued, that the decree

of foreclosure upon the mortgage of Hunt, was void, and the purchase under the sale by the master conferred no title. By the death of Daniel Duval the suit abated, and was never revived against the heirs, who were indispensable parties.

The proceedings before the county court, were *coram non udice:* because; 1. The petitions did not describe the land. 2. They did not state the names of the heirs, which which were *femes covert* or infants, &c. 3. There was no citation ordered; that to Elliott was a nullity; because the names of the heirs, for whom he was appointed, were not stated.

The commissioners, under the decree of the county court did not make their report in due time, and the court should not have received it; because its jurisdiction in the matter was at an end.

The deed from Mrs. Duval and her mother Madame Caro, was incompetent evidence,—it does not appear that the former had any dower allotted to her, and the latter had conveyed her interest, previously, to Daniel Duval.

The mortgage from Duval to the Caro's was incompetent evidence, and there was no proof by the production of the bonds secured, or otherwise, that the debt intended to be secured, was not punctually paid by the mortgagor. The promissory notes read to the jury, were inadmissible; because, 1. The mortgage debt was due by bond, or obligation. 2. The notes produced, were payable to Madame Caro, instead of all the mortgagees.

The order of the county court of July, 1828, to re-sell a portion of the real estate of the plaintiffs' ancestor, which had been sold in 1827, was wholly unauthorized; the court had no right to set aside the previous sale, or to direct the sale of an equity of redemption. The powers of a court of chancery were competent to give all proper relief.

The mortgage from Duval to the Caro's, may have invested the latter with the right of entry, yet they never exercised it, during the life of the mortgagor, and it was tolled by his death. [2 Bla. Com.]

It is not enough for the defendant to show, that there was legal evidence introduced by him, sufficient to warrant the verdict of

the jury. The jury are to determine the effect of all the evidence submitted to them, and what the court might think conclusive, the jury might think insufficient.—So, if any part of the evidence of title, introduced by the defendant shall be adjudged insufficient, the judgment of the circuit court must be reversed.

J. A. CAMPBELL & STEWART, for the defendant—insisted that the deed of Mrs. Duval and her mother to the defendant, was admissible as evidence, that Mrs. D. as an heir of Beneto Caro, or of some of her brothers and sisters may have had an interest either immediate or contingent—and Madame Caro, having never joined with her husband, in a conveyance, was certainly entitled to the interest which the Spanish laws conferred on her in virtue of her marriage.

The proceedings on Hunt's mortgage were not void—though the principle is generally true, that only parties and privies are bound by a decree, yet Hunt himself had an interest and applied for a sale of the mortgaged premises. Now, although the heirs of Duval may not be foreclosed of their equity of redemption, yet the decree and sale under it may operate as an assignment by the court, made on the application of Hunt, and thus invest McLoskey, the assignee, with the legal estate. [Ryder v. Innerarity, 4 S. & Por. Rep. 32.]

In respect to the proceedings in the county court, they were certainly competent evidence. No petition for an order of sale appears in the record, it is true, but the recitals in the orders of the court, are evidence that petitions were filed, and that they were in conformity to law.—These recitals also show, impliedly, that the heirs were all infants; else why appoint a guardian *ad litem*—they further show that the guardians answered the petitions, and that proof, by depositions, was taken to sustain the suggestions of the petitions.

The inquiry is not whether the proceedings in the county court are regular and irreversible on appeal, or writ of error; but whether enough appears of record, to show that the jurisdiction of that court rightfully attached. If the jurisdiction of the court was put in exercise, it is immaterial how irregularly the proceedings may have been conducted to a close. [Wyman

*et al.* v. Campbell *et al.* 6 Porter's Reports 249: Lee v. Campbell *et al.* 6 Porter's Reports 249: Couch & Robinson v. Campbell *et al.* 6 Porter Reports 262.] Here the record shows, that there were parties, and the court rendered decrees in cases of which its jurisdiction is unquestionable.

It is objected that the decrees were not executed in the manner they direct. Though the decree may have appointed a time when the commissioners should make their return, this time is not so indispensable, that its non-observance shall annul every thing that may have been done under the authority of the court. It is competent for the court to receive the report of the commissioners and to confirm the sale, notwithstanding the day for its return may have elapsed.

The mortgage from Duval to the Caro's, and the assignment from the Caro's to the defendant of the notes and the mortgage, gave to the defendant a legal title to the mortgaged premises, and enables him to defend himself against the plaintiffs. [2 Ohio Rep. 224: 1 T. R. 758: 8 B. & C. Rep. 767: 11 Mass. 216: 17 Johns. Rep. 112: 6 Eng. Cond. Ch. Rep. 404: 3 Mass. Rep. 560: 17 Mass. Rep. 419: 2 Cowen's Rep. 211: 10 Johns. Rep. 480: 7 Cow. Rep. 1.] There was no necessity for producing the evidences of debt intended to be secured by the mortgage—but if it were necessary, the defendant was not bound to show a bond as described in the mortgage—it was competent to prove by extrinsic evidence, that the indebtedness referred to was evidenced by promissory notes instead of a bond. [7 Cowen's Rep. 1.]

A mortgagee may enter upon the mortgaged premises immediately after the execution of the mortgage, even before a forfeiture, unless the mortgagor stipulates for his possession. [8 Gill. & Johns. Rep. 39; 16 Mass. Rep. 39; 11 Pick. Rep. 475; 2 Greenl. Rep. 65; 1 Binn. Rep. 176; 2 N. Hamp. Rep. 433.] And after an entry, payment will not authorize the mortgagor to recover possession on an ejectment, but he must proceed by bill in equity. [17 Mass. Rep. —; 3 Mass. Rep. —.]

It is no objection to the assignment of the mortgage by the Caro's, that Duval's heirs were in possession of the land mort-

gaged, the possession of the latter was not adverse to the former. The mortgagor is tenant at will of the mortgagee, and his possession is consequently not adverse. It is true, that a descent cast will toll an entry; but this principle is only applicable in those cases, where the ancestor enters, not only without title, but in open defiance of the title; as where one enters as an abator, disseizor or other deforciant. When a party enters or retains possession by the permission of another, neither himself, nor his heirs can dispute the title of that other.

The statute which requires claims against the estates of deceased persons to be presented within eighteen months from the grant of letters testamentary, or of administration, is a defence personal to the executor, or administrator. And though it might be indispensable in an action on the notes, to prove their presentation within the time limited by law, yet the omission to present them, cannot be allowed to bar a proceeding in equity on a mortgage executed for their security. [Ludlow v. Van Camp, 2 Hall's Rep. 113; Fonb. Eq. 530; Belknap's administrator &c. v. Gleason, 6 Conn. Rep. N. S.]

The power to set aside a sale of property made under its direction, or in virtue of its process, pertains to all courts. The county court upon the decree for a re-sale, did not direct a mere equity of redemption to be sold, but the commissioners were directed to sell independently of mortgages.

The objections to the greater part of the evidence offered by the defendant, went rather to its admissibility than its sufficiency to prove any thing material to the defence. If therefore, the evidence objected to, might have been aided by other proof, it was clearly admissible, and was properly received.

HOPKINS, in reply, insisted that Mrs. Duval was estopped from claiming any interest in the estate of her husband, in consequence of her having petitioned the county court to sell it, in order to pay his debts.

The acquisitions from the act of Congress of May, 1824, did not inure to the mortgagees—the mortgage described the estate by quantity and does not embrace the space between Water street and the river Mobile.

It is not admitted, that it was competent to show by extrinsic proof, the identity of the notes produced with the bond intended to be secured by the mortgage to the Caro's, but if such evidence was admissible, there was no effort to adduce it.

In respect to Hunt's mortgage, the decree of the court did not operate an assignment of it to the defendant. The court did not nor would have taken jurisdiction of the case for any such purpose. This mortgage has been satisfied by a sale of the mortgaged premises, though the defendant, as a purchaser, acquired no title, (2 Mason Rep. 531,) and the title of the heirs must be regarded as entirely discharged from incumbrance.

COLLIER, C. J.—1. It is a general rule, that all persons whose interests are to be affected or concluded by the decree, ought to be made parties to a bill for the foreclosure of a mortgage. If they are not made parties, the decree of foreclosure and sale does not bind them. (Story's Eq. Pl. 177 ) So if the mortgagor, who is the owner of the fee, should die, his heir is an indispensable party to a bill to foreclose; so much so, that the cause cannot be proceeded in, until the bill is revived against him. (King v. Tullock, 2 Sim. Rep. 469; Story's Eq. Plead. 180; Polk v. Clinton, 12 Ves. Rep. 48, 56; Bradshaw v. Outram 13, Ves. Rep. 235.)

Whenever by any means, any interest of a party to the suit, in the matter in litigation, becomes vested in another, the proceedings are rendered defective, in proportion as that interest affects the suit; so that although the parties to the suit may remain as before, yet the end of the suit cannot be obtained. And if such a change of interest is occasioned by, or is the consequence of the death of a party whose interest is not determined by his death, or by the marriage of a female plaintiff, the proceedings become likewise abated or discontinued, either in part or in the whole. For as far as the interest of a party dying, extends, there is no longer any person before the court by whom, or against whom the suit may be prosecuted. (Mitford's Eq. Pl. 56 '7 and cases there cited.) The suit then, *quoad* a party

dying, in law parlance, abates, that is, there is a suspension of all proceedings in the case for the want of proper parties capable of proceeding therein, or of being proceeded against. Figuratively speaking, the suit is in a state of suspended animation, and may be revived. (Mitford's Eq. Pl. 58.; Nicoll v. Roosevelt, 3 Johns. Ch. Rep. 60.) Whenever there is an abatement, the remedy to be applied in order to impart vitality to the suit, is a bill of revivor. (Calvert on parties in Eq. 92 '3 4', 104 et post, and cases there cited; Story's Equity Pleadings 289, and cases there cited.) The death of Duval pending the bill of Hunt for a foreclosure, operated an abatement of the suit; and his heirs became entitled to the equity of redemption, in the same manner that their ancestor was while living. In order to afford them an opportunity of protecting that interest, and to authorize the court to divest it in favor of the purchaser under the decree of foreclosure, the heirs were indispensable parties. (Story's Eq. Pl. 177; Calvert on parties in Eq. 179; Wilkins & Hall v. Wilkins 4 Porter's Rep. 245.)

There is not the slightest pretence, that the plaintiffs were made parties to the suit of Hunt. No bill of revivor, or other similar proceeding was ever resorted to for that purpose. True the death of Daniel Duval was suggested, and a guardian *ad litem* appointed for his heirs, and a *scire facias* directed to issue to him; but it does not appear from the record in that case, which the bill of exceptions professes to set out *in extenso*, that such process was ever isssued. The guardian never having appeared and answered, an entry was made as follows: " This day came the complainant by his solicitor, and John F. Everett, who was appointed guardian *ad litem* to the infant heirs of the said Daniel Duval, having failed to answer. It is ordered that this case be referred to Thomas White, who is hereby appointed master in chancery, to ascertain the amount due from the defendants to complainants, and he is hereby directed to report immediately." On the next day the master made his report, which was confirmed and the decree rendered for a foreclosure and sale under which the defendant purchased a part of the property in dispute.

The regular mode of reviving a suit against the heirs of a defendant dying during its pendency, we have already seen, is by bill of revivor; yet we will not say, that if the heirs are made parties by *scire facias*, the decree when drawn collaterally in question, would be held *void* for the irregularity. It is unnecessary to consider that question, since the heirs of Duval were not made parties in any manner.

It was argued for the defendant, that even conceding the decree of foreclosure and sale does not divest the plaintiffs of their equity of redemption, yet they will operate as an assignment of Hunt's mortgage; that Hunt having resorted to the court, in order to collect his debt, by a sale of the mortgaged premises, and having acquiesced in the decree and the consequent proceedings, this allowed the defendant to be substituted to all his rights, both in the debt and the mortgage; and it is not now permissible for the plaintiffs to urge the invalidity of the assignment. This argument is confessedly ingenious; yet we think it cannot be sustained. Hunt did not ask the interference of equity, merely to enable him to make an assignment of his mortgage. His power to perform that act without judicial sanction was entirely competent. A transfer of the debt intended to be secured, whether by indorsement or a mere delivery, would in equity, pass the security, and a written transfer of the debt and mortgage would vest the assignee with the legal interest in both. Such being the rights of the mortgagee, equity would not entertain jurisdiction for a purpose so entirely profitless, as the mere approval of an act, which might have been done out of court, without the authority of a decree.

A decree of foreclosure and sale certainly does not operate merely as an assignment of the debt and mortgage to the purchaser. The creditor who takes a mortgage to secure a debt by bond or otherwise, has three remedies, either of which he is at liberty to pursue; and all of which it is said, he may pursue, until his debt is satisfied. He may bring an action at law on the bond, or he may put himself in possession of the rents and profits of the land mortgaged, by means of an ejectment, or tres-

pass to try titles; or he may foreclose the equity of redemption, and sell the land to satisfy the debt. (Coote on Mortgages, 518: McCall v. Lenox, 9 Sergt. & Rawle's Rep. 302: Jackson v. Hill, 10 Johns. Rep. 481.) The action on the bond or other evidence of indebtedness, is resorted to, for the recovery of the money intended to be secured. The action of ejectment, or trespass, is an auxiliary remedy; and the bill in chancery is of the same character. The ejectment or trespass, is used to get possession of the mortgaged property; the bill in chancery, to remove incumbrances from it. When a judgment at law is obtained for the money, the character of the indebtedness is changed, being merged in the judgment, which constitutes a debt of record. So, where there is a decree of foreclosure, the mortgage becomes merged in it, and ceases to exist as a legal security for the debt. (Reedy v. Burgert, 1 Ohio Rep. 71: Tice v. Annin, 2 Johns. Ch. Rep. 125: Dunkley v. Van Buren, 3 John. Ch. Rep. 330: Hughes v. Edwards *et ux.* 9 Wheat. Rep. 489.) Such being the case, a decree of foreclosure, if valid, is a complete extinction of the mortgage; and if invalid, must be so for all purposes, and cannot serve as an authority to assign the mortgage by means of a sale.

Again: It is held that a decree of foreclosure and a sale under it, operates as a payment, to the extent of the sum paid by the purchaser, deducting therefrom the costs and charges with which the fund is properly chargeable. (Newell *et al.* v. Wright, 3 Mass. Rep. 150: Amory v. Fairbanks *et al.*, ibid. 562: Hedge v. Holmes; 10 Pick. Rep. 380.) The payment of the debt extinguishes it, so that there is no subsisting contract to assign; and the contract being at an end, the mortgage, which is but an incident, terminates with it.

Whether *equity* would afford relief to a purchaser under a void decree, by subrogating him to all the rights of the mortgagee, to the payment of whose demand the purchase money had been appropriated, and thus keep alive, as against the mortgagor and his heirs, the mortgage, as a security for his reimbursement, is a question which cannot arise in a controversy *at law,* and we therefore decline its examination.

It has been considered, in the absence of all stipulation upon the point, that the mortgagee was not entitled to recover the mortgaged premises of the mortgagor, until the deed became absolute at law, by the non performance of the condition. (Lessee of Ely v. McGuire, 1 and 2 Ohio Rep. 372.) But however equitable such a rule might be, the general current of authority maintains the right of the mortgagee to enter at any time upon the land mortgaged, or bring an action for the recovery of the possession, unless it appears by express stipulation, or necessary implication, that the parties understood that the mortgagor should remain in the possession. (4 Kent's Com. 148, 158: Coote on Mortg. 330, 351: Hartshorn v. Hubbard, 2 N. Hamp. Rep. 453: Newman v. Chapman, 2 Rand. Rep. 93: Blaney v. Bearce, 2 Greenl. Rep. 132: Flagg v. Flagg, 11 Pick. Rep. 475: Brown v. Cram, 1 N. Hamp. Rep. 169: Colman v. Packard, 16 Mass. Rep. 39: Southerin v. Mendrum, 5 N. Hamp. Rep. 420: Pettingell v. Evans, ibid. 54: Newhall *et al.* v. Wright, 3 Mass. Rep. 138: Dexter v. Harris, 2 Mason's Rep. 531: Eastbrook v. Moulton, 9 Mass. Rep. 258: Simpson's lessee v. Ammon, 1 Binney's Rep. 175: Evans and Iglehart v. Meniken, 8 Gill and Johns. Rep. 39.) But the mortgagor is regarded as the proprietor of the mortgaged premises, and entitled to their possession, as against all persons but the mortgagee or his assignees; and consequently, if wrongfully dispossessed, he may maintain an ejectment to be let into the possession. (Blaney v. Bearce, 2 Greenl. Rep. 132: Huntington v. Smith, 4 Conn. Rep. 235: McCall v. Lenox, 9 Sergt. and Rawle's Rep. 302: Stanard v. Eldridge, 16 Johns. Rep. 254: Ford v. Philpot, 5 Har. and Johns. Rep. 312: Hitchcock v. Harrington, 6 Johns. Rep. 295: Coles v. Coles, 15 Johns. Rep. 330: Dickerson v. Jackson, 6 Cowen's Rep. 147: Astor v. Hoyt *et al.* 5 Wend. Rep. 603: 4 Kent's Com. 148 to 158, and cases there cited.)

Our conclusion then, upon this branch of the case is, that by the death of Duval, Hunt's suit abated; that his heirs were indispensable parties, in order to foreclose their equity of redemption; that they were not made parties by bill of revivor or oth_

erwise; that the decree, as rendered, did not operate an assignment of Hunt's mortgage to the defendant; and that, although the mortgagee is entitled to the actual possession of the mortgaged premises, if he desire it, yet the mortgagor is to be regarded as the legal proprietor, as against all other persons, and consequently, is entitled, if dispossessed, to maintain ejectment, or other appropriate action.

II. It is argued for the plaintiffs, that the proceedings in the county court, in regard to the real estate of Daniel Duval, are void, and will not aid the title of the defendant, because—1. The orders of the court directing a sale were not made in pursuance of petitions previously filed. 2. In one case, the heirs of Duval are not designated by name. 3. In both cases, the citation is directed to issue to the individual appointed a guardian *ad litem,* by order of the court, instead of the heirs. 4. Henry V. Chamberlain and Curtis Lewis, the commissioners appointed to execute the decree of the 17th May, 1827, did not make their report within sixty days, as therein directed. 5. The proceedings, for the purpose of obtaining orders of sale, do not appear to have been regularly continued up to the time when the orders were made, nor does the record show, that the orders were made on judicial days. 6 The order of the 19th July, 1828, setting aside the sale of the defendant, under the order or decree of the 7th May, 1827, was unauthorized, and the resale, of consequence, void: and 7. The order, directing a re-sale, was void, inasmuch as it required the commissioners to sell an equity of redemption.

It may be proper to premise that the proceedings in the county court, originated under an act of December 1822, authorizing an administrator or executor to " file a petition in the county court of the county in which letters of administration, or letters testamentary, have been granted, setting forth that the personal estate of his intestate or testator (as the case may be,) is not sufficient for the payment of the just debts of such intestate or testator, or, that the real estate of such testator or intestate, cannot be equally, fairly and beneficially, divided among the heirs or devisees of such intestate or testator, without a sale of the real estate,

Doe *ex dem.* Duval's heirs v. McLoskey.

setting out and particularly describing in such petition, the estate proposed to be sold, and the names of the heirs or devisees of such intestate or testator; and particularly stating which are of age, and which are infants or *femes covert.*" The act further directs, that upon filing the petition in open court, it shall be the duty of the court to order citations to all the heirs and devisees, who are of full age, and to the husband of such as are *feme covert,* requiring them to appear on a particular day mentioned therein, at a regular or adjourned term of said court, and answer the petition; and it is made the duty of the court, forthwith to appoint guardians to such of the heirs or devisees, as are infants, to answer and defend against the same. And where a sale of the estate shall be ordered or decreed by the court, commissioners shall be appointed in the order or decree, with directions to sell the estate, either for money or on credit, as may be most just and equitable; and to report to the court at the time limited in the order or decree. The act further provides, that upon the coming in of the reports of the commissioners, the court shall render a final decree in the cause; and if the terms of the sale have been complied with by the purchaser of the estate, the commissioners shall be directed by such final decree, to convey the estate sold to the purchaser. These are the only parts of the act which relate to the questions raised.

I. In respect to the first objection to the proceedings of the county court, it cannot avail the defendant. It is true, the statute requires that the executor or administrator, shall file a petition in open court, as the initiatory step towards obtaining an order or decree for the sale of the real estate of their testator or intestate; yet if the court goes on to render its decree, it cannot be intended, from the *absence* of such a paper merely, that it was never filed. The intendment most rational, would be, that it was lost after the rendition of the decree. (Wheeler v. Bullard, 6 Por. Rep. 360.)

But here, it cannot be necessary to intend any thing which the record does not fully establish. By that, we are informed that the administratrix filed her petition, in which the lands sought to be sold were particularly described.

2 and 3.   If it were necessary to sustain the jurisdiction of the county court, we would perhaps intend that the names of the heirs, with the allegation of infancy, were set out in the petition as required by the statute.   But as the jurisdiction of the court did not depend upon the regularity of its proceedings, the omission to designate the heirs by name, &c., and the direction of the citation to the guardian cannot prejudice the title of a purchaser under the decree for a sale.   The jurisdiction of the court attached, as soon as it recognized the petition, by appointing a guardian and ordering the issuance of a citation.   The proceeding "is *in rem,* against the estate of the intestate, and not *in personam;*" and cannot be made void by the misdirection of the citation.   The cases of Wyman *et al.* v.  Campbell *et al.* 6 Porter's Rep. 219, and Couch & Robinson v.  Campbell *et al.* Ibid 262, fully establish this conclusion.   In these cases, this court decide, that where the jurisdiction of a case has once attached and the court proceeds to render its final judgment, order or decree, the proceeding cannot be collaterally impeached, though the record may abound with irregularities, which would authorize its reversal upon a *direct appeal.*

But it is argued for plaintiffs, that the proceedings of the county court, commenced in April, 1827, are void as against them, because not being made parties *eo nomine,* they cannot prosecute a writ of error in order to their revision.   Perhaps the statute, which provides for the issuance of writs of error by inferior courts, would not embrace the case of the plaintiffs; yet we apprehend that the powers of this court, in virtue of its general superintendency of "inferior jurisdictions," would be adequate to the emergency.   (Bett's administrator v.  Taylor, 6 Porter's Rep. 333; Seawell v. Bate's aministrator, 2 Stew't. Rep. 462; 3 ibid. 199.)

4.  The act of 1822, requires the commissioners appointed to sell, to report to the court at the time limited in the order or decree; and the court is required, upon the coming in of the report of the commissioners, to render a final decree in the cause.   This requisition, as to the duty of the commissioners, must be regar-

ded as directory; though they omit to comply with the directions of the decree, it is competent for the court to receive and confirm their report at a subsequent day. If the law were otherwise, it would be within the power of the commissioners, to defeat the title of a purchaser, at pleasure, by a neglect or refusal to perform their duty. If the commissioners fail to make their report at the appointed time, it is competent for the court to take measures to compel them to make it, and upon its being made, to confirm it, by a final decree. Such a power is indispensable to the attainment of justice.

5. Even if the omission of the record, to show that the proceedings of the county court had been regularly continued up to the rendition of the decree, was available on error, it cannot render the decree void and thus prevent the title from vesting in the purchaser. But we think the defect in the record of the county court, would not be fatal on error. In Green v. McGehee, 3 Porter's Rep. 398, it was held that, as by law, all causes not tried or otherwise disposed of at each term, shall stand continued of course to the next term, it is not necessary that an order of continuance should be entered in each case—it is sufficient if it does not appear that the case was disposed of. The statute characterizes the proceeding in the county court as a *cause*, and the regular day for the disposition of the business pertaining to the estates of deceased persons as a *term;* so that the act on which the case cited rests, may be considered as strictly applicable.

In respect to the objection, that the orders or decrees for the sale of the real estate do not appear to have been made at a regular or adjourned term of the county court, it may be remarked that the reverse does not appear, and we must intend that they were made in conformity to the statute. Such an intendment would be indulged, even if a writ of error were prosecuted for the purpose of revising the orders or decrees.

6 and 7. The order by which the sale to the defendant under the decree of May, 1827, was set aside, was clearly unauthorized. That sale had been confirmed in December following, and the commissioners directed to make title to the purchaser.

The court might upon the report of the commissioners have refused to confirm their proceedings, and perhaps have declared the same to be null; but seven months after the sale had been confirmed, it was not competent to annul the final decree and order a re-sale. A court, from which an execution issues, may set aside a sale made under it, (Mobile Cotton Press, &c. v. Moore & Magee, 9 Porter's Rep. 679) on the ground, that courts of jurisdiction possess a controlling power over the acts of their officers and their process. But where a judgment or decree has been perfected and the term of the court closed, it is not allowable to vacate it on motion. The order of sale and the final decree by the county court, may be assimilated to a decree directing a sale of mortgaged premises upon a foreclosure of a mortgage, which *requires the master to make report of the sale.* Suppose, upon the coming in of the report, the court should render a final decree confirming it and directing the purchaser to be furnished with the necessary evidence of title, would it be competent for the court of chancery *to set aside its final decree at a subsequent term?* Such a power would not be claimed for that court, and certainly, upon principle, the final decree of the county court should be held quite as sacred.

The order then, by which the sale to the defendant was set aside, being void, it will follow that the decree for a re-sale was unauthorized by law. That the county court cannot decree the sale of the real estate of a deceased person, on which mortgages exist, and provide for their payment from the proceeds, will not perhaps, be controverted.—Such a power, regularly pertains to a court of equity. But whether a sale of the mortgagor's interest, under a decree of the county court (as seems to have been made,) *will not confer upon the purchaser the right to redeem,* is a different question, which the view already taken makes it unnecessary to decide.

III. We have already seen that an assignment of a debt, secured by a mortgage, will, *at least* in equity, transfer an interest in the mortgaged property, and that if the mortgage itself be also regularly assigned, the legal interest in both will vest in the

assignee. [See Hatch v. White, 2 Gallis' C. C. Rep. 152.] So, it has been held that the assignee of a mortgagee in possesion, may protect his possession by showing an assignment. [Jackson *ex dem*. Minkle v. Minkle and another, 10 Johns. Rep. 480; Barker v. Parker *et al.*, 4 Pick. Rep. 505; Jackson *ex dem*. &c. v. Babcock, 17 Johns. Rep. 112.] and the assignee, in virtue of the assignment, becomes invested with all the rights and remedies, to which the mortgagee, was entitled. [Jackson *ex dem*. &c. v. Bowen, 7 Cowen's Rep. 1; Wilson v. Troup, 2 Cowen's Rep. 195.] Without attempting to controvert the correctness of these principles, it has been argued for the plaintiffs, that they cannot avail the defendant; because 1. The mortgage to the Caro's was never assigned by the mortgagees, so as to pass to the defendant a right to the possession of the mortgaged property. 2. The mortgagees or their assignee, never having taken possession of the mortgaged property during the lifetime of the mortgagor, by his death, a descent was cast upon his heirs, which tolled the right of entry from all persons claiming under the mortgagees. 3. The debt intended to be secured, not having been presented to the personal representative of the mortgagor, within eighteen months after the grant of the letters of administration became extinct; and the mortgage, being a mere incident, cannot be enforced.

1. It is objected, that the deed by which the mortgage is assigned, is not executed by all the mortgagees. This objection, we think, is not well taken. Upon an inspection of the mortgage and assignment, it is clearly inferable, that one or more of the female mortgagees had married between the periods when the two deeds were executed—and where this appears to have been the case, both husband and wife join in the assignment. True, the first names of several of the mortgagees are spelt differently in the mortgage and assignment, yet it sufficiently appears from a comparison of the two deeds, that the names are the same—the names perhaps, being spelt in the one, according to their literal pronunciation, and in the other, with orthographical accuracy.

But is further objected, that a transfer of an interest in the mortgaged property, without an assignment of the debt intended to be secured, is a mere nullity—the former, being an incident to the latter, will adhere to it, and independently, of it, cannot be assigned; [Jackson *ex dem.* &c. v. Curtis, 19 Johns. Rep. 325—and 7 Cowen's Rep. 231; Wilson v. Troup,] that there is no proof of the assignment of the debt to the defendant, and he cannot, consequently, claim as assignee of the mortgage.

The mortgage does not describe the "two certain bonds or obligations," as being made payable to the mortgagees, but merely recites that, "Daniel Duval is justly indebted to the said parties of the second part, &c." The mortgage then is not contradicted by the production of securities payable to "*Maria Machado Caro*" one of the mortgagees, but the reasonable intendment is, that although one of the parties is named in the notes, yet all, in whose favor the mortgage is made, are interested in the proceeds.

If the law be, as it has been determined in the cases cited from *Johnson and Cowen's Reports,* then it is clear, that the securities intended to be embraced by the mortgage, should be described with reasonable certainty, in order that they may be identified by a comparison, or else they should be shown by extrinsic proof to be the evidence of the identical debt to which the mortgage refers. That parol proof of the identity of the debt is admissible, is sustained by the most respectable authority.

In Shiveras *et al.* v. Caig & Mitchell, 7 Cranch's Reports 50, the mortgage purported to secure a debt of £30,000 sterling, due to all the mortgagees. But it was really intended to secure different sums due, at the time to particular mortgagees; advances afterwards to be made, and liabilities to be incurred to an uncertain amount. The mortgage was upheld, because it was executed in good faith. The court remarking, that the real transaction appearing to be fair, though somewhat variant from that which is described; it would, therefore, be unjust and unprecedented to deprive the person, claiming under the deed, of his real, equitable rights, unless it were in favor of a person who has been, in fact,

injured and deceived by the misrepresentation. And in Jackson *ex dem.* &c. v. Bowen, 7 Cowen's Reports 19, the mortgage referred to a bond *bearing even date for seven hundred and fifty dollars*, executed by the mortgagor to the *mortgagees.* The bond intended to be secured was dated a few day's prior to the mortgage, payable to the mortgagees and two others; and was a bond of indemnity, &c. against a promissory note for seven hundred and fifty dollars, executed by the mortgagees and the two others to the mortgagor or *order,* dated *November* 18*th* 1817; which the makers were obliged afterwards to pay. It was held that the variance was immaterial, and that the reference was sufficiently certain; or if not, that it might be made so by parol evidence, showing that the bond produced, was the one intended. These citations may suffice to show, that a misdescription of the debt intended to be secured, will not vitiate a mortgage; and that the variance may be explained by extrinsic proof.

In concluding that a mortgage cannot assign the right to the mortgaged property, without also assigning the debt to which it is an incident, we do not desire to be understood as intimating that it is incompetent for the mortgagee to relinquish, *by contract, the possession* to a third person, at any time, until the debt is paid.—But the defendant does not claim to occupy under such a contract—he insists upon the validity of the assignment to himself.

In the case before us, no evidence was offered to show that by " two certain bonds or obligations" as referred to in the mortgage, were intended the two promissory notes produced at the trial, but the reverse is rather inferable. The admission of the notes, without this additional proof according to the view we have taken, was erroneous.

2. The common law gave to the legal owner, an extra judicial and summary remedy by *entry,* when another person, having no right, had previously taken possession of lands and tenements. In such case the party entitled, might make a formal but peaceable entry thereon, declaring that, thereby he took possession,

93

and this notorious act of ownership, was considered equivalent to a feodal investiture by the lord. And this entry gave seizin, or put into immediate possession him that had a right of entry on the estate, and thereby made him complete owner and capable of conveying from himself by either descent or purchase.

This remedy, by entry, was allowed only in case of ouster by *abatement, intrusion and disseizin;* for the original entry of the wrongdoer being unlawful, a remedy was afforded by the mere entry of him who had right. And this right of entry was taken away by a descent cast.

The descents, which take away entries, are when any one, seized, by any means whatsoever, of the inheritance of a corporeal hereditament, dies, by reason whereof the same descends to his heir: in such case, however feeble the right of the ancestor might be, the entry of any other person who claims title to the freehold is taken away; and he cannot recover possession against the heir, by this summary method, but is driven to his action to gain a legal seizin of the estate. And the reason why the right of entry is tolled, is, *first*, because the heir comes to the estate by act of law, and not his own act; the law, therefore, protects his title, and will not suffer his possession to be divested, till the claimant has proved a better right. *Secondly*, because the heir may not suddenly know the true state of his title, and therefore, the law, which is ever indulgent to heirs, takes away the entry of such claimant, as neglected to enter on the ancestor, who was well able to defend his title; and leaves the claimant only the remedy of an action against the heir. *Thirdly*, because the rule was adapted to the military spirit of the feodal system, and tended to make the feodatory bold in war; since his children could not, by any mere entry of another, be dispossessed of the lands, whereof he died seized. And *lastly*, because it was agreeable to the dictates of reason, and the general principles of the common law. [3 Bla. Com. 174 to 179: 2 Bac. Ab. 304 to 312: 3 Reeve's Eng. L. 16: 4 Ibid. 236: 2 Hilliard's Ab. 177 and 190: Co. Lit. 266. a. 238. a. 240. b. 256. a. Adams on Ejectment 41 to 45: Taylor v. Horde, 1 Burr. Rep. 60: 12

East's Rep. 41: Carter v. Tash, 1 Salk. Rep. 241: Doe *ex dem.* v. Staple, 2 T. Rep. 684.

Though the effect of a descent cast, upon the right of entry in the cases enumerated, is generally, as we have stated it, yet there are exceptions to the rule. [See 2 Bac. Ab. 307 to 311, and the authorities above.] And it has been held, that ejectment lies after a descent cast, though there is no right of entry. [Mockbee v. Clagett, 2 Har. & McH. Rep. 1, and 3 Ohio Rep. 237.] So, also, where the entry of the party, or his ancestor, was originally lawful, and the continuance in possession only unlawful, the entry is not tolled. [Dowl & R. Rep. 41.] But it is needless to consider this doctrine further, since it is clear that *even conceding* the common law, in this particular, to be in *full force here*, it cannot be applied to the defendant as the assignee of the mortgage to the Caro's.

Supposing the assignment to be valid, we have seen that the assignee was placed in the same situation which the mortgagee previously occupied. Now the mortgagee had a continuing right of entry, which he might exercise at any time; or he might, at his election, permit the mortgagor to retain the possession. It is said the mortgagee is entitle to the possession, that he may prevent waste, and keep the property from being lessened in value in any way, and also to enable him to receive the rents and profits. (Southerin *et al.* v. Mendrum, 5 N. Hamp. Rep. 420: Newhall v. Wright, 3 Mass. Rep. 138.) For so long as he permits the mortgagor to remain in possession, he has no right to the rents and profits. (*Ex parte* Wilson, 2 Vesey and B. Rep. 252.) The right of entry then, in such a case, results from the contract of the parties: it is a continuing right, to be exercised or not, at the pleasure of the mortgagee; and depending upon contract, cannot be divested by the death of the mortgagor, or other event, which does not annul the mortgage, or bar a remedy upon it. Other reasons might be stated, to show the inapplicability of the doctrine, in regard to a descent cost, to the case of the defendant; but those already noticed are deemed conclusive.

*3.* Since the argument at the bar, a gentleman interested as counsel in another case, in sustaining the views of the plaintiffs, upon the point we are now to examine, has submitted to us, some written suggestions, with a reference to authorities, in which he insists, that the limitation in regard to suits against executors and administrators, is materially different, in its operation and effect, from the general statute of limitations. That, although an administrator may not be bound to plead the general statute, yet he is bound to plead the statute which relates to him, in that character; and that the latter act not only bars the *remedy*, but *extinguishes the debt*. And further, so regardful is the law, of the interest of all parties, who are entitled to any part of the estate of deceased persons, that the plaintiff, in declaring, must show that his demand is not barred by a failure to present it within the proper time. It is then concluded, that as the debt intended to be secured is the principal, and the mortgage the incident, the debt being extinguished by the statute prescribing the time, within which claims against the estate of a testator or intestate, must be presented to the personal representative, the mortgage of consequence ceases to retain a valid existence.

This argument is attempted to be sustained, by decisions of the supreme court of Massachusetts, founded on the legislation of that State. The first enactment declares, that " No executor or administrator, after having given notice of his appointment, as provided in the first section, shall be held to answer to the suit of a creditor of the deceased, unless it be commenced within four years from the time of his giving bond as aforesaid, excepting in the cases hereinafter excepted." *It has been held,* that this special limitation is not created for the personal convenience of the executor or administrator, but for the benefit of the persons interested in the estate he may represent ; and that although an administrator is not bound to plead the general statute, yet he is bound to plead this statute which relates directly to himself. *And further,* that although an acknowledgment by an executor or administrator, after the time limited by the general statute, may revive a debt against the tes-

tator or intestate, yet his acknowledgment will not have that effect, if the time prescribed by the special statute has elapsed. For, being bound to plead the latter, whenever it would bar the debt claimed, no promise or admission on his part, could operate to defeat the plea. *And lastly,* the special act not only suspends the remedy, but extinguishes the debt. (Brown *et al.* v. Anderson, Administrator, 13 Mass. Rep. 201: Scott v. Hancock *et al.* ibid. 162: Emerson v. Thompson *et al.* 16 Mass. Rep. 429: Thompson v. Brown *et al.* 16 Mass. Rep. 172: Dawes v. Shed *et al.* 15 Mass. Rep. 7: Hall v. Bumstead 20 Pick. Rep. 2: Angell on Lim. 283 to 290.

There is certainly nothing in the terms of the act cited, to show that the debt is extinguished. It merely declares, that the executor or administrator shall be held to answer to the suit of any creditor, &c., not that he shall not be bound to pay the debt. This language is not more stringent than that employed in the general statute of limitations of Massachusetts, which is as follows: " The following actions shall be commenced whithin six years next after the cause of action shall accrue, and not afterwards," &c. It is the acknowledged office of the courts of Massachusetts, to expound her own statutes; yet we cannot help thinking, that harmony of decision would have been better preserved by determining that the special, like the general act, merely barred the remedy.

In some of the cases cited it is regarded as a clear principle that a promise by an executor or administrator, will remove the bar of the general, though not of the special statute. This distinction in our opinion, is not defensible. In neither case will the promise revive the remedy. In Peck v. Botsford, 7 Cown. Rep. 180, the supreme court of Connecticut in considering the effect of such a promise say, " our laws regard an executor as an agent or trustee; without any beneficial interest given to him by the will. The personal property is indeed vested in him to pay the debts and legacies of the deceased. The residue goes to the heir or devisee. His duty is to settle the estate according to law; and not to subject it to debts by his admission." The

case of Thompson v. Peter, 12 Wheat. Rep. 563, is an authority quite as direct to show that an executor or administrator cannot revive a debt against the estate he may represent by a promise to pay.

In Gookin v. Sanborn *et al.* 3 N. Hamp. Rep. 491, it was held that a claim against the estate of a deceased person is extinguished, if not exhibited to the executor or administrator within the time prescribed by law. But the terms of the statute of New Hampshire are so explicit that the court could have attained no other conclusion. So far as need be noticed, they are as follows: "That in case any creditor shall neglect to exhibit his or her demand against said estate, to the executor or administrator within the term of two years next after proving the will, or taking administration &c., such demand shall be extinguished, and the creditor totally barred from recovering the same."

The remaining provision of the Massachusetts statute, on which one of the authorities cited rests, is in these word: "After the settlement of any estate by an executor or administrator, and after the expiration of the time limited for the commencement of actions against him, by the creditors of the deceased, the heirs, next of kin, devisees and legatees of the deceased, shall be liable in the manner provided in the following sections, for all debts which could not have been sued for, against the executor or administrator, and for which provision shall not have been made, &c." Again: "any such creditor whose right of action shall first accrue, after the expiration of the said time of limitation, and whose claim shall not have been presented to the judge of probate, or, if presented, shall not have been allowed, &c., may recover the same against the heirs and next of kin, of the deceased, and the devisees and legatees under his will, each one of whom shall be liable to the creditor, to an amount not exceeding the value, whether of real or personal estate, that he shall have received from the deceased," &c. "And provided further, that no such suit shall be maintained, unless it be commenced within one year next after the time when the right of action shall first accrue." (Rev'd. Statute of Mass. ed. 1836, p. 448.) In

Hall v. Bumpstead *et al* 20 Pick. Rep. 2, it was decided that in an action against an heir, the plaintiff must bring himself within this enactment, and the declaration must show, that administration had been taken out on the estate of the ancestor, that the demand was not due, and payment of it could not have been claimed and enforced within four years after the grant of administration, and that the action was brought within one year after payment of the demand could, by law, be enforced. It is argued, upon the authority of this case, that it is incumbent upon a party, who sets up a claim against the estate of a deceased person, to show affirmatively in his pleading, that the claim was presented to the executor or administrator, within the proper time. We think the case cited, gives no countenance to the conclusion attempted to be deduced from it. An executor or administrator is liable to the payment of the debts of his testator or intestate to the extent of the assets, in virtue of the common law; and all that is necessary in pleading, either at law or in equity, is to set forth, with legal precision, a demand, which the deceased is liable to pay. Matters of avoidance must come from the defendant. But the liability of the heirs is of an extraordinary character—created by and depending upon the statute; and according to all analogy, a party suing the heirs must bring himself within the provisions of the act by apt averments and proof. And in conformity to this view, is the principle of decision in the case cited. This disposes of the written suggestions submitted to us, so far as they are pertinent to the present inquiry; and our opinion is, that they do not establish the conclusion, that the bar of the debt intended to be secured, operates in bar of all proceedings on the mortgage.

But we have a statute of our own, in reference to which this point must be considered: it is in these words: " All claims against the estates of deceased persons, shall be presented to the executor or administrator, within eighteen months after letters testamentary, or letters of administration shall have been granted to said executor or administrator, and not after; and all claims not presented within the time aforesaid, shall be forever barred

from a recovery: *Provided,* That the provisions of this section shall not extend to persons under age, *feme covert,* persons insane, or *non compos mentis,* to debts contracted out of this territory, nor to claims of heirs, or legatees, claiming as such." This statute does not require the creditor to sue within any definite period, but merely directs that his claim shall be *presented.* The consequence of a failure to present it, is not an *extinguishment* of the demand, but merely a *bar of its recovery.* Here then, there is no ground for the argument, that the debt being extinguished, the mortgage which is mere incident, becomes also inoperative.

We have already seen that a mortgagee of land has three several remedies. 1. An action upon the bond or other evidence of indebtedness, intended to be secured. 2. An action to recover the possession; and 3. A suit in equity, with the view to a foreclosure and sale. And he may prosecute all or either of these remedies at the same time, until he obtains satisfaction. Such being the law, we cannot conceive how the loss of one remedy should bar the others. (Lamb v. Clark, 5 Pick. Rep. 193: Miller *et al.* v. Miller, 7 Pick. Rep. 133: Ferriss v. Ferriss, 1 Root Rep. 465: Ashley v. Hill, 6 Conn. Rep. 246.) If the duty still remains, the plaintiff may adopt any appropriate means for its enforcement.

A mortgage, as we have seen, passes to the mortgagee, as between himself and the mortgagor the estate in the land; and therefore gives something more than a mere security for a debt. It confers a specific lien upon property, of which the mortgagee, unless restrained by contract, may at any time take possession and retain it, until the debt is paid: and consequently the decisions, in regard to the effect of liens, after the statute has run against the debt, are strictly applicable. In Spears v. Hartley, 3 Esp. Rep. 81, Lord Eldon declared it as his opinion, that though the statute of limitations has run against a demand, if the creditor obtains the possession of goods, on which he has a lien for a general balance, he may hold for that demand, by virtue of the lien. And in Higgins v. Scott, 2 Barnw. & Adol. Rep. 431: *Hyatt,* an attorney, claimed a lien upon a judgment, though his

debt was barred by the statute of limitations; whereupon it was contended that the lien was gone. But the court held, that the statute barred the remedy but not the debt, and that the attorney who had taken no steps to recover his costs for six years, had still a right to be paid from the sale of the property under execution. True, these are cases of a lien on personal estate, but the principle which influenced their decision is strictly applicable to real estate; and the continuance of the lien, in respect to both descriptions of property, must depend upon the existence of the debt.

The estate of the mortgagor, (in order to make the security available,) having vested in the mortgagee, so long as the debt continues, he should be permitted to reduce the mortgaged property into posession at any time, until the statute has run against an action of ejectment. Or he might waive that remedy and proceed in equity for a foreclosure and sale. This conclusion seems necessarily to follow from the consideration that, the statute operates to defeat the remedy, without discharging the duty.

It may seem, quite a refinement to speak of a right as existing, which can never be revived or enforced, yet a long continued course of decision, has so often recognized it, in the construction of the statute of limitations, that it may be considered a principle too firmly fixed to be changed, save only by legislation.

The mortgagee then, having a specific lien for the payment of his debt, there can be no reason why he should advise the administrator of his debt, in order to have the benefit of the lien. The grant of letters of administration does not confer upon the grantee the right to administer the realty. True, he may ask and upon proper proof obtain an order from the court appointing him, for the sale of the land of the deceased, for payment of debts, &c. but he cannot receive the proceeds until he executes an additional bond. This being the case, surely there is no necessity for presenting to the administrator the claim of the mortgagee; unless the security is deemed insufficient, and the estate of the deceased is looked to for the deficiency—in the lat-

ter case, the presentation of the claim, as required by our statute, is indispensable.

This view, is deemed sufficient, to show that the validity of the mortgage assigned by the *Caro's* to the defendant is not impaired by the failure to present the notes intended to be secured to the administrator of Duval, within the time limited by statute. [See Belknap v. Gleason, 6 Conn. Rep. 2d series 160: Lingan v. Henderson, 1 Blands. Rep. 282:                   v.
2 Hals. Rep.: Hughes *et al.* v. Edwards and wife, 9 Wheaton's Rep. 489: Elmendorf v. Taylor, 10 Wheaton's Rep. 152.

IV. In respect to the deed from Maria Machado Caro and Catharine Duval to the defendant, its inadmissibility was not shown to the circuit court, so as to have authorized its rejection. The plaintiffs objection to it, was founded upon the assertion, that the grantors had no tranferable right to the property embraced by their deed. No evidence was adduced to the court to sustain the objection, and the court could not regard it as well founded, merely upon the suggestion of counsel. The defendant might have given in evidence a conveyance from Mrs. Caro and Mrs. Duval, and then have shown by proof, that they had such a title as was the subject of sale. If this auxiliary proof was not offered, the plaintiffs might then have called upon the court to reject the deed, or instruct the jury as to its legal effect. But the bill of exceptions does not thus present to us the legal question.

V. The letters from the defendant to Mrs. Duval, during her residence in Cuba, do not tend *directly* to destroy the title which the defendant had sought to establish by his proof; nor do they directly aid the plaintiffs' title. And if they were admissible for any purpose, it was as indirect evidence to impair the defendants title, by showing that so far as it was deduced from Mrs. D. it had its origin in fraud, and was of consequence, void. In thus limiting the only purpose for which these letters to be received by the jury, it will follow from what we have said, that the circuit court did not err.

VI. The depositions taken in the suit in chancery, were rightfully rejected. Under the circumstances in which they

were offered, they would have been inadmissible, though the parties had been the same at law as in equity. In Pleasants v. Clements, (2 Leigh's. Rep. 474, 482,) it was determined that on the trial of an action at law, depositions taken in a suit in chancery, between the same parties, are not proper evidence, unless the witness be dead, or otherwise incapable of attending the trial. Our statutes in regard to depositions in suits at law, very clearly inhibit the admission of such proof.

VII. It is unnecessary to inquire whether the land in controversy, lying between Water street and the channel of the river, vested in Hunt and the Caro's, under the mortgages from Duval, or whether the plaintiffs, as the heirs of the mortgagor, are not entitled, under the act of Congress of the 26th of May, 1824, " Granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of the said city," as the question will not probably arise on a subsequent trial. In the case of the Mayor and Aldermen of Mobile v. Eslava, (9 Port. Rep. 577) it was decided that the act referred to, did not interfere with the rights of riparian proprietors, *and that Congress did not possess the constitutional right to grant the shore of the navigable waters within the States.* If the part of the land sought to be recovered in virtue of the act of Congress, was, at the period stated in the act, embraced (as it is supposed) within the limits of the shore, then the case cited, is decisive of the point.

VIII. We think the court very properly refused to instruct the jury that the purchases made by the defendant, of the real estate of Daniel Duval, did not inure to the plaintiffs so as to authorize them to recover at law. The plaintiffs did not make the defendant their attorney, and as he did not act in that capacity, they could not object to his purchases merely because he was an agent. Mrs. Duval did not, nor could have invested the defendant with authority to purchase the property of her intestate's estate, for the benefit of those interested therein—nor does it appear that she ever insisted upon the benefit of any purchase made by him.

It appropriately pertains to equity, to set aside a purchase by a trusteee or agent, made at a sale on account of his *cestui que trust.* That tribunal alone can do justice between the parties, by placing them *in statu quo.* And in that tribunal too, the plaintiffs if they have been injured, and will make out a proper case, can obtain redress. It might be competent for them to show that the defendant availed himself of his agency to their prejudice, and became the purchaser of the land of their father's estate, at a sum less than its value. (Saltmarsh v. Beene, 4 Porter's Rep. 283, and cases there cited.)

IX. By the twenty-first rule for the government of the practice in chancery, (1 Stew't. Rep. 618) it is provided that " where a suit at law and a bill in chancery, are instituted for the same claim or demand, the defendant on *suggestion,* supported by affidavit, may move the court to inspect the records, and if it appear that the two suits are for one and the same cause of action, it shall be ordered that the plaintiff elect, in which he will proceed, and that he dismiss the other.

This rule is imperative, and requires that the plaintiff shall *dismiss* either his suit in equity, or at law, where the causes for which they are brought are identical. If therefore the circuit court upon an inspection of the records, was satisfied as to their identity, the refusal to permit the name of the defendant to be stricken from the record at law, or a *nolle prosequi* to be entered as to him was clearly proper,—the rule leaving no *discretion* as to the course of procedure.

The other questions arising upon the second bill of exceptions, cannot now be considered—they regularly come up, on a revision of the case in chancery.

Other points than those examined have been raised, but the view already taken, will most probably lead to a decision of the case on its merits, and we consequently deem it unnecessary to notice them more particularly. Without attempting to recapitulate the various questions adjudged, we will content ourselves with declaring that the judgment of the circuit court is reversed, and the case remanded.